# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

BRIDGET S.,

                                                    Plaintiff,

        v.

                                                                6:20-CV-1440
KILOLO KIJAKAZI, ACTING                                         (ATB)
COMMISSIONER OF SECURITY,

                                                    Defendant.

PETER W. ANTONOWICZ, ESQ., , for Plaintiff
MICHAEL L. HENRY, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

## MEMORANDUM-DECISION AND ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 5).

## I.    PROCEDURAL HISTORY

On June 28, 2018, plaintiff protectively filed an application for a period of disability and disability insurance benefits ("DIB"), alleging that she became disabled on March 16, 2018. (Administrative Transcript ("T.") 10, 72, 142-48).  The claim was denied initially on October 29, 2018. (T. 80-84).  Plaintiff requested a hearing, which was held by video conference on January 23, 2020 before Administrative Law Judge ("ALJ") Bruce S. Fein. (T. 63-95).  Plaintiff testified at the hearing, represented by counsel. (*Id.*)  ALJ Fein issued an unfavorable decision on March 13, 2020, which

became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on October 15, 2020. (T. 1-5 (AC Denial), 10-20 (Hearing Decision)).

## II.    GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work

42 U.S.C. § 1382(a)(3)(B).  The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of

2

the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience … Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d

3

255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.   <u>FACTS</u>

Plaintiff was born on April 30, 1970, and she was 49 years old at the time of the ALJ's hearing. (T. 34).  She finished the 12th grade in school, but did not attend college. (T. 34).  Plaintiff lived in a one-story home with her husband, who was employed full-time, working a 3-11 p.m. shift. (T. 34-35, 58).  She had a valid driver's licence and drove once or twice per week. (T. 58).  Beginning in 2004, most of plaintiff's prior work experience was as a home health worker. (T. 35-38).  She was responsible for assisting elderly clients with activities of daily living, running errands, and taking care of any pets. (T. 36).  Depending on the client, plaintiff estimated that she could have lifted up to 200 pounds and was on her feet most of the day. (T. 36).  She also had prior work experience assembling the wiring for lawnmowers. (T. 38-39).  Plaintiff was not

required to lift more than 10 pounds for the lawnmower work, and she could perform the job either seated or standing, depending on the project. (T. 39-40). She was also required to stoop or squat and reach overhead. (T. 40). Plaintiff also worked as an order picker for Family Dollar and for Running Warehouse.[1] (T. 41-42).

Plaintiff testified that she could not do her former job as a home health care worker due to the pain in her back which prevented her from being on her feet or sitting for more than five or ten minutes at a time. (T. 42). She stated that she was unable to lift "heavy things." (T. 42). Plaintiff testified that her pain was sometimes sharp and sometimes burning or stabbing. She sometimes had pain her right hip which radiated down her leg. (T. 43). Plaintiff later testified that she would be unable to perform the wiring job because it would require her to stand or sit too long. (T. 57-58).

Plaintiff testified that her depression prevented her from working because she was unable to concentrate. (T. 44). She stated that she also suffered from migraine headaches which required her to lie down in a dark room, two to three days per week, lasting from one to five hours. (T. 45). Plaintiff testified that she took Tylenol for these headaches. (T. 46). She stated that she had been having these headaches for two years. She also stated that her treating Nurse Practitioner diagnosed these headaches as migraines, but was not prescribing any specific medication, nor had he referred plaintiff to a neurologist to address the issue. (T. 46).

---

[1] Plaintiff previously filed for disability benefits, but was denied in May of 2016. (T. 177). Plaintiff went back to work as a home health aide until she was laid off in 2018. (T. 180-82, 204). Her order filler job at Running Supply, during which she might lift 50 to 75 pounds and was required to reach constantly, was also performed after the denial of her previous application. (T. 41-42)

Plaintiff testified that her husband helped her with her household chores. (T. 47). She stated that she only vacuumed once per week, and she was unable to do so for more than five minutes before her back began to bother her. (T. 47). She also stated that she did not cook as much as she did before having these impairments. (*Id.*) Plaintiff testified that she did not sweep or mop, and she could only wash dishes for three minutes at a time before she had to lean on the counter for relief. (T. 48).

Plaintiff testified that she was getting injections[2] from her treating physician to address her back pain. (T. 48). She also stated that she took muscle relaxers for her back pain.[3] (T. 48-49). Plaintiff first stated that the medication did not have any side effects, but then stated that it made her sleepy approximately three to four times per week. (T. 49). Physical therapy made plaintiff's pain worse, so her doctor told her to stop. She was given exercises to do at home, which she did "sometimes." (*Id.*) Plaintiff testified that she spent approximately six hours per day lying on her recliner, using her heating pad for her back. (*Id.*)

Plaintiff testified that she had difficulty getting dressed and often had to sit on the bed to get dressed and to put on her socks. (T. 51). She stated that her husband helped her get out of bed and helped her get dressed approximately four or five times during the week. Plaintiff testified that she had a railing on her bed that she could use to get herself up. (T. 52). She testified that, once, her husband had to help her when she

---

[2] Plaintiff later testified that she got three injections in the last year. (T. 55).

[3] Plaintiff later testified that she only took Tylenol for the pain, and that they "tried many different medications," but nothing seemed to work. (T. 58-59). Plaintiff stated that she did not wish to take narcotics because they made her sick. (T. 59).

fell in the shower. (T. 51).

Plaintiff stated that she only cooked twice per week. (T. 53). She made spaghetti or a roast in the crock pot. (*Id.*) However, plaintiff's husband carried the water for the spaghetti to the stove and drained the pasta into the colander when it was done cooking. (*Id.*) Plaintiff testified that she could only lift two or three pounds and only purchased milk in half-gallon sizes because a gallon was too heavy for her to lift. (T. 54). She also testified that, if she lifted anything that was "heavy or too heavy," she got a sharp pain in her back. (T. 55). Plaintiff could only stand for three to five minutes without leaning on something. (*Id.*)

Plaintiff testified that her son was killed in April of 2019, and she began to suffer from depression at that time. (T. 56). She specifically stated that, depression was not one of the causes of her disability on her onset date, and she was focusing on her physical issues in the instant application. (T. 56). However, plaintiff later testified that depression had taken over her life, but that she was not ready to get treatment or to see a counselor about the condition. (T. 61-62). The ALJ questioned plaintiff extensively on why she was not obtaining certain treatment for either her physical or her mental conditions. (T. 58-62).

There is a substantial amount of medical evidence in the administrative record. Rather than reciting the evidence at the outset, I will discuss the relevant materials in my analysis of plaintiff's claims.

## IV.   THE ALJ'S DECISION

At step one of the sequential evaluation, the ALJ found that plaintiff met her

insured status requirements for DIB through December 31, 2023. (T. 12).  The ALJ found that plaintiff had the following severe impairments at step two: lumbar spondylosis with radiculopathy and major depressive disorder. (T. 13).  The ALJ found that, although plaintiff had a history of headaches, high cholesterol, and nicotine dependence, "most, if not all" of those conditions were either resolved, required little or no treatment, or were adequately controlled by existing treatment. (*Id.*)  None of plaintiff's additional impairments imposed "more than minimal limitations on the [plaintiff's] ability to perform basic work activities for a continuous period of at least twelve months." (*Id.*)

At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (*Id.*)  The ALJ considered Listing 1.04 (disorders of the spine) and Listing 12.04 (depressive, bipolar and related disorders).  At step four, the ALJ found that plaintiff could perform light work, except that she could only occasionally climb, balance, stoop, kneel, crouch, and crawl. (T. 15).  She could frequently reach. Mentally, plaintiff required a low-stress job, which is defined as one involving only occasional decision-making, changes in the work setting, and use of judgment. (*Id.*)

Based on the above RFC, the ALJ found that plaintiff could not perform any of her past relevant work. (T. 18).  However, at step five, the ALJ found that based on plaintiff's RFC, and considering her age, education, and work experience, she could perform other jobs which exist in significant numbers in the national economy. (T. 19). In making his step five determination, the ALJ determined that if plaintiff had the RFC

8

to perform a "full range" of light work, Medical Vocational Rule 202.21 would direct a finding of not disabled. (*Id.*)  The ALJ then determined that plaintiff's nonexertional impairments did not significantly erode the available occupational base.[4] (T. 19-20). The ALJ based this decision on Social Security Ruling ("SSR") 85-15 and 85-14 which describe limitations that do not significantly diminish the broad range of jobs available in the exertional work category because the particular category of work does not require the ability to perform all of those functions. (*Id.*)  Because the plaintiff's additional limitations did not significantly erode the available occupational base for unskilled light work, the ALJ determined that "a finding of 'not disabled' was appropriate under SSRs 85-15, 85-14 and the framework of the Medical-Vocational Rules." (T. 20).

## V.   ISSUES IN CONTENTION

Plaintiff raises the following arguments in support of her position that the ALJ's decision is not supported by substantial evidence:

1.   The ALJ failed to properly assess and weigh the medical evidence. (Pl.'s Br. at 10-12) (Dkt. No. 15).

2.   The ALJ erred in failing to obtain the services of a vocational expert ("VE"). (Pl.'s Br. at 12-14).

Defendant argues that the ALJ's decision was supported by substantial evidence, and the complaint should be dismissed. (Def.'s Br. at 4-10) (Dkt. No. 16).  For the following reasons, this court agrees with the defendant and will dismiss the complaint.

---

[4] If the plaintiff cannot perform substantially all of the exertional demands of a particular category of work, and/or has nonexertional limitations the Medical Vocational Guidelines may be used as a framework, "unless there is a rule that directs a conclusion of 'disabled' without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14)." (T. 19).

## VII.   RFC/Weight of the Evidence

### A.   Legal Standards

#### 1.   RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267

(N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence.  *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 2.      Weight of the Evidence

In making a disability determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996).  Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings."  The responsibility for determining these issues belongs to the Commissioner.  *See* SSR 96-5p, 1996 WL 374183, at *2.  These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d).  The ALJ must clearly state the legal rules that he applies and the weight that he or she accords the evidence considered.  *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324,

2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

The regulations regarding the evaluation of medical evidence were amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.  According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion."  Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors."  20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

### 3.    Credibility/Consistency

In evaluating a plaintiff's RFC for work in the national economy, the ALJ must take the plaintiff's reports of pain and other symptoms into account. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  The ALJ must "'carefully consider'" all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.'" *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3); Social Security Ruling (SSR) 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 81 FR 14166-01 at 14169-70, 2016 WL 1020935 (Mar. 16, 2016)).

In 2016 the Commissioner eliminated the use of term "credibility" from the "sub-regulatory policy" because the regulations themselves do not use that term. SSR 16-3p, 81 FR at 14167. Instead, symptom evaluation tracks the language of the regulations.[5] The evaluation of symptoms involves a two-step process. First, the ALJ must determine, based upon the objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).

If so, at the second step, the ALJ must consider "'the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.'" *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing inter alia 20 C.F.R. § 404.1529(a); *Genier v. Astrue*, 606 F.3d at 49) (alterations in original).[6]

If the objective medical evidence does not substantiate the claimant's symptoms, the ALJ must consider the other evidence. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (citing superceded SSR 96-7p). The ALJ must assess the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and

---

[5] The standard for evaluating subjective symptoms has not changed in the regulations. Rather, the term "credibility" is no longer used, and SSR 16-3p makes it clear that the evaluation of the claimant's symptoms is not "an evaluation of the claimant's character." 81 FR at 14167. The court will remain consistent with the terms as used by the Commissioner.

[6] The court in *Barry* also cited SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996) which was superceded by SSR 16-3p. As stated above, the factors considered are the same under both rulings.

intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### B.    Analysis

Plaintiff argues that the ALJ did not properly analyze the November 28, 2018 medical source statement ("MSS") of plaintiff's treating physician, Dr. Nicholas Qandah, D.O. of CNY Brain & Spine Neurosurgery. (T. 409-410).  In this check-box form, Dr. Qandah states that he treated plaintiff from May 9, 2018 until November 14, 2018. (T. 409).  Dr. Qandah opines that plaintiff can lift and carry ten pounds or less "occasionally" and can lift and carry ten pounds or less "frequently."[7] (*Id.*)  Dr. Qandah checked a box indicating that the plaintiff could stand and/or walk ***without leaning or supportive device at one time without a break***" for 20 minutes or less. (*Id.*) (emphasis added).  He found that plaintiff could stand and/or walk for 2 "total hours" during the day, "***without leaning or supportive device***."  Dr. Qandah checked a box indicating that plaintiff could "sit in an upright position, ***without leaning or slouching***, and with hands free to use" for one hour or less at a time and for two hours in an 8-hour day. (*Id.*)

---

[7] The questions in counsel's MSS form are quite specific, asking first, how much weight can plaintiff lift and carry "occasionally" during an 8-hour day, and second, how much weight the plaintiff can lift and carry "frequently" during the same period of time. (T. 409).  Dr. Qandah answered both questions with the same amount of weight. "Occasionally" is defined in the form as "1 to 2 times per hour throughout an 8-hour period of time", and "Frequently" is defined on the form as "4 to 6 times an hour throughout an 8-hour period of time." (*Id.*)

(emphasis added).

However, Dr. Qandah also found that plaintiff would not need to lie down "intermittently throughout the day at an unpredictable frequency," nor would she have to elevate her feet "above 15 inches" during the day. (T. 409). Dr. Qandah found that plaintiff could occasionally climb, balance, kneel, crouch, crawl, and stoop. (T. 410). Her ability to reach in all directions, handle, finger, and feel was "***unlimited***." (*Id.*) Dr. Qandah estimated that plaintiff's pain, fatigue, and concentration deficits were present to the extent that she would be off-task for 25% of an 8-hour day, would have good days and bad days, and would be absent approximately one day per month. (*Id.*)

The ALJ found that the above MSS was "largely unpersuasive" because it was "merely a check-box form, with no references to specific clinical or diagnostic findings," and it was inconsistent with the medical evidence of record. (T. 17). The ALJ also did not adopt Dr. Qandah's opinion that plaintiff would be "off-task" 25% of the work day or would be absent once per month. (*Id.*) The ALJ stated that this opinion was "purely speculative," not supported by the doctor's treatment notes,[8] and not consistent with her mental examinations which were "unremarkable." (*Id.*)

As stated above, after 2017, the ALJ is not required to give "controlling weight" to any particular medical opinion.[9] Instead, the ALJ determines a report's

---

[8] The ALJ stated that the MSS was not consistent with Dr. Qandah's treatment notes because they did not indicate that plaintiff regularly missed or arrived late for scheduled appointments. (T. 17).

[9] Although plaintiff's brief begins by citing what appears to be the pre-2017 standard, which is not applicable to this case, later in the brief, plaintiff appears to acknowledge that the post-2017 standard applies. (*See* Pl.'s Br. at 10-11) (first stating that even if contradicted, the treating physician must be given greater weight than any other physician, then acknowledging that "the reference to controlling weight is now inapplicable).

persuasiveness, considering a variety of factors, including the supportability and consistency of the medical evidence in relationship to the record as a whole. 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).  The ALJ in this case acted in accordance with the new regulations in finding that Dr. Qandah's MSS was "largely unpersuasive."

Although Dr. Qandah found that plaintiff could not lift more than ten pounds, Dr. Elke Lorensen, M.D. consultatively examined plaintiff on September 7, 2018 and found that plaintiff had no more than "moderate" limitations for bending, lifting, reaching,[10] and squatting and no gross limitations for sitting, standing, walking or handling small objects with her hands. (T. 16) (citing T. 376).  A review of Dr. Lorensen's examination shows that plaintiff's gait was normal, she used no assistive device, and she needed no help changing or getting on and off the examination table. (T. 374). She had some range of motion limitations in her spine, and a slight decrease in sensation in her right leg below her knee, but her strength was 5/5 in both her upper and lower extremities. (T. 375).  Her grip strength was 5/5, and her hand and finger dexterity was intact. (*Id.*) The ALJ also cited a report by State Agency physician, James Lawrence, M.D., who found on October 29, 2018 that plaintiff was capable of "medium work." (T. 16, 75-76, 78).

"Moderate" limitations for sitting, standing, walking, lifting, and carrying have been held to be consistent with an RFC for light work. *Michael V. v. Comm'r of Soc. Sec.*, No. 6:18-CV-0481 (GTS), 2019 WL 4276722, at *5 n.3 (N.D.N.Y. Sept. 10, 2019). *See also Raymonda C. v. Comm'r of Soc. Sec.*, No. 3:19-CV-0178 (GTS), 2020

---

[10] Dr. Qandah found plaintiff had "unlimited" ability to reach. (T. 410).

WL 42814, at *4 (N.D.N.Y. Jan. 3, 2020) ("[A] 'moderate limitation' . . . is essentially equivalent to an ability to perform light work.") (collecting cases); *Gurney v. Colvin*, No. 14-CV-688S, 2016 WL 805405, at *3 (W.D.N.Y. Mar. 2, 2016) (finding that moderate limitations for "repetitive heavy lifting, bending, reaching, pushing, pulling or carrying" are consistent with an RFC for a full range of light work); *April B. v. Saul*, No. 18-CV-0682, 2019 WL 4736243, at *5 (N.D.N.Y. Sept. 27, 2019) ("[M]oderate limitations in standing and walking are consistent with light work.") (citations omitted); *Moore v. Comm'r of Soc. Sec.*, No. 16-CV-270, 2017 WL 1323460, at *8 (N.D.N.Y. Apr. 10, 2017) ("[M]oderate limitations for sitting, standing, walking, bending, climbing stairs, and lifting or carrying heavy objects . . . [are] consistent with light work.") (citations omitted); *Martinez v. Comm'r of Soc. Sec.*,  No. 13 Civ. 159, 2016 WL 6885181, at *13 (S.D.N.Y. Oct. 5, 2016), *report and recommendation adopted*, 2016 WL 6884905 (S.D.N.Y. Nov. 21, 2016) ("[M]oderate restrictions for lifting, pushing, pulling, overhead reaching, stooping, squatting, prolonged standing, and prolonged walking . . . are consistent with an RFC for light work.")

Moreover, a review of Dr. Qandah's contemporaneous examination records show that they do not support the extent of the limitations that he expresses in his MSS.  The review of symptoms ("ROS") sections of Dr. Qandah's contemporaneous reports are all check-box responses.[11] (*See* T. 348-49).  Plaintiff's physical examinations resulted in multiple normal findings in reflexes and strength in both upper and lower extremities.

---

[11] The ROS sections were completed by other health care providers ("clinical staff") in Dr. Qanhah's office. (*See e.g.* T. 345) ("The above sections was [sic] completed by clinical staff. Patient information reviewed by attending Physician ***and or Midlevel Physician Assistant***) (emphasis added).

(T. 340).  In May of 2018, Dr. Qandah found[12] that although plaintiff had pain in her lumbar spine, her spinal alignment and gait were normal, sensation was grossly intact in both upper and lower extremities, and her shoulder abduction, biceps flexion, triceps extension, grip, and "intrinsic finger" were all 5/5 bilaterally as were her hip flexion, knee flexion, plantar flexion, and dorsiflexion.[13]  (T. 345).  Hoffman's Sign[14] was positive at that time. (T. 345).  A contemporaneous cervical MRI showed "no significant pathology." (T. 345-46).  An MRI of the brain was ordered and was performed on July 6, 2018. (T. 346, 347).

On July 18, 2018, plaintiff expressed that she was having headaches in addition to radiating, aching, and sharp pain in her back and legs, aggravated by almost every position. (T. 348).  Depression and anxiety were also checked off in the ROS.[15]  (T. 349).  The July physical examination was almost identical to the May examination. (T. 350).  However, no lumbar pain was noted in the physical examination. (*Id.*)  Plaintiff's

---

[12] Although the report appears to be signed by "agent of provider Kevin Gehr," the report states that the information was "reviewed" with Dr. Qandah and he was "present in clinic." (T. 346).  Not all the reports indicate that they were reviewed by Dr. Qandah, and some are signed by other medical staff, with the notation that Dr. Qandah was "present in the clinic," but the box indicating that the doctor reviewed the report is not checked. (*See e.g.* T. 433 (Oct. 2, 2019) (box indicating Dr. Qandah's review is not checked), 434 (signed by Physician's Assistant Alexander Carangelo)).

[13] Dr. Qandah also noted that plaintiff's mood and affect were both normal. (T. 345).

[14] Hoffman's Test is a neurologic evaluation, which if positive, can indicate "an upper motor neuron lesion and corticospinal pathway dysfunction likely due to cervical cord compression. However, up to 3% of the population has been found to have a positive Hoffman without cord compression or upper motor neuron disease." https://www.ncbi.nlm.nih.gov/books/NBK545156/  The court notes that on August 23, 2018, Hoffman's Sign was negative according to neurologist Glady Jacob, M.D. to whom plaintiff was referred for evaluation of possible multiple sclerosis by Dr. Qandah. (T. 367-69).

[15] Depression and anxiety were not checked off in the previous report. (T. 344).  These reports state that the review of symptoms was completed by the "clinical staff." (T. 345, 349).

spinal alignment and gait were normal, and her reflexes and strength were 5/5 throughout. (T. 350).  Her mood, affect, and judgment were all normal. (*Id.*)  A review of the MRI of plaintiff's brain showed a small pineal gland cyst, but "no acute intracranial abnormality." (*Id.*)  A lumbar MRI showed facet narrowing L4-5. (*Id.*) However, a lumbar MRI dated October of 2019 stated that there was "no acute disease and no significant interval changes." (T. 435).

Plaintiff was examined in Dr. Qandah's office in October of 2019.  At that time, although she was in no acute distress, her spinal alignment was normal, and there was no "extremity length discrepancy," plaintiff's gait was antalgic, and it was noted that she used a cane. (T. 433).  This report was not signed by Dr. Qandah, he does not appear to have performed the examination, nor does the report indicate the doctor reviewed its findings. (T. 433).  The only difference in plaintiff's physical examination was that her right hip flexion was listed as "4/5." (*Id.*)  Her mood, affect, and judgment were all normal. (T. 433).  As the ALJ correctly noted in his decision, while some of the plaintiff's medical examinations have noticed an irregular gait, most do not. (T. 16) (citing T. 387 (antalgic gait), 433 (antalgic gait), and 442 (mild antalgic gait)), 345, 350, 368, 391, 425, 448, 456, 467 (all noting normal gait)).

The ALJ also reviewed reports by Dr. Richard Mutty, M.D., who examined the plaintiff three times, once in 2018 and twice in 2019, for purposes of workers' compensation. (T. 17).  In November of 2018, Dr. Mutty found that plaintiff should be limited to "'at best light work activity," but should only lift ten pounds "occasionally." (T. 17) (citing T. 457).  Plaintiff would also be unable to work in a "stooped" position,

and she would have to change positions frequently. (*Id.*)  In March of 2019, Dr. Mutty opined that plaintiff would be limited to sedentary work, lifting only 10 pounds occasionally. (T. 449).  However, in July of 2019, Dr. Mutty stated that plaintiff could lift and carry 15 pounds occasionally, and push and pull up to 20 pounds occasionally. (T. 464).  He concluded that plaintiff would be limited to "sedentary to very light work." (T. 465).  Dr. Mutty found that plaintiff could reach, grasp, and manipulate "frequently." (*Id.*)

While Dr. Mutty's ultimate conclusions regarding plaintiff's percentage of disability or her ability to perform a particular exertional category of work are not binding on the Social Security Administration, the doctor's examinations and physical findings are considered. *See Lohnas v. Astrue*, 510 F. App'x 13, 14-15 (2d Cir. 2013); *Todd E.O. v. Comm'r of Soc. Sec.*, No. 5:20-CV-1046 (CFH), 2022 WL 326629, at *8 (N.D.N.Y. Feb. 3, 2022) (citing 20 C.F.R. § 416.904, *Bartko v. Comm'r of Soc. Sec.*, No. 1:13-CV-373 (GLS/ESH), 2014 WL 4973158, at *6 (N.D.N.Y. Sept. 30, 2014) ("despite differing definitions and eligibility standards, disability determinations made by other government agencies . . . are entitled to some weight and should be considered")).

The ALJ also considered a functional capacity evaluation performed by an occupational therapist, Raymond Alessandrini, OTR/L. (T. 17).  On July 24, 2018, Mr. Alessandrini concluded that the plaintiff was "'capable of assuming a position in the light strength category,' providing among other things, that she not walk 'at all.'" (T. 363).  However, the court notes that Mr. Alessandrini did find that the plaintiff could

20

perform the lifting required for the Dictionary of Occupational Titles ("DOT") definition of "light work." (T. 363).

In this case, the ALJ specifically considered Dr. Mutty's and Mr. Alessandrini's findings and stated that they were not "fully persuasive" because they were "inconsistent with one another," and were not supported by the clinical evidence, particularly because during Dr. Mutty's examinations, the plaintiff walked with a normal gait pattern and was able to get on and off the examination table unassisted. (T. 17). The ALJ noted that plaintiff had some low back tenderness, reduced spinal range of motion and bilaterally positive straight leg raising, but no motor or sensory deficits in her lower extremities. (*Id.*) (citing T. 446-473) (Dr. Mutty's reports).

The ALJ found that the level of limitation proposed by Dr. Mutty and Mr. Alessandrini[16] were not supported by the MRI evidence from 2018, including the cervical MRI, showing only "mild" degenerative foraminal stenosis and the lumbar MRI, showing only "mild" central canal stenosis at the L4-5 level.[17] (T. 17) (citing T. 346 (cervical), 398 (lumbar)). The court notes that the October 2019 lumbar MRI confirmed these findings. (T. 478-79) (finding that the paravertebral soft tissue

---

[16] The court notes that, other than the unusual walking restriction, Mr. Alessandrini found that plaintiff could perform all other aspects of light work, including the lifting and reaching requirements. (T. 363).

[17] In April of 2018, plaintiff was examined by Dr. Thomas Haher, M.D. at Syracuse Orthopedic Specialists ("SOS"). (T. 305). Dr. Haher noted that plaintiff appeared in moderate pain, and she had moderate tenderness over the left and right paraspinal lumbar areas. However, her gait and coordination were normal, and her lumbar range of motion was "minimally limited" in all directions. (*Id.*) Her motor examination was 5/5 with no sensory deficits, clonus was absent in both feet, and straight leg raising was negative bilaterally. (*Id.*) Dr. Haher reviewed an April 2018 MRI, which showed no gross pathology, no canal or foraminal compromise, and no evidence of instability. (*Id.*) Plaintiff was still working at her home health care job at the time.

structures were within normal limits, there was no acute disease, and there were no significant interval changes).

In August of 2018, Dr. Qandah referred plaintiff to Dr. Glady Jacob, M.D., a neurologist. (T. 367-69).  The referral was made in order to determine whether plaintiff's symptoms, without objective findings, could be due to multiple sclerosis ("MS"). (T. 367).  Neurologically, Dr. Glady found that plaintiff was alert, oriented, her recent and remote memory was intact, her attention was within normal limits, her speech was fluent, and her knowledge and vocabulary were consistent with her education. (T. 368).  Her motor strength was 5/5 bilaterally in her upper and lower extremities. (*Id.*)  Her  muscle tone, and muscle bulk were normal in both upper and lower extremities. (*Id.*)  Her deep tendon reflexes were 3+ bilaterally, Hoffman's test was negative, and clonus[18] was negative. (*Id.*)  Sensation was grossly intact, and she walked with a normal gait.  Plaintiff did not express anxiety or depression during the encounter. (*Id.*)  Dr. Glady found that plaintiff had lumbosacral radiculopathy and lumbar spondylosis. (T. 368).  Plaintiff was symmetrically hyperflexic.[19]  Dr. Glady noted that plaintiff's headaches were "occasional" and "improving." (*Id.*)  There were no signs of MS. (*Id.*)

There is conflicting and sometimes inconsistent evidence in the record.

---

[18] Clonus is involuntary and rhythmic muscle contraction, caused by a permanent lesion in descending motor neurons. https://pubmed.ncbi.nlm.nih.gov

[19] This finding was likely made due to the 3+ deep tendon reflexes. https://www.ncbi.nlm.nih.gov (discussing grades of deep tendon reflexes - 3+ is listed as a very brisk response which may or may not be normal).  Dr. Glady found that the reflex was abnormal, but stated that he would need to check the thoracic MRI.  It does not appear that a thoracic MRI was performed, only cervical, brain, and lumbar.

However, it is for the ALJ, not the court to weigh conflicting evidence and establish an RFC that is consistent with the record as a whole. *Tammy S. o/b/o A.L.S.*, No. 1:20-CV-931 (DB), 2022 WL 1488431, at * 11 (W.D.N.Y. May 11, 2022) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("It is for the SSA, and not this court, to weigh the conflicting evidence in the record"); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) ("In our review, we defer to the Commissioner's resolution of conflicting evidence."). "'If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusions must be upheld.'" *Id.* (quoting *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014)). The ALJ's RFC determination is supported by substantial evidence in the record as a whole, Dr. Lorensen's consultative assessment, the State Agency physician's opinion and other medical evidence of record, including reports from her own treating sources, showing that plaintiff had full strength in her upper and lower extremities, and her limitations would not prevent her from light work, with the additional restrictions as stated by the ALJ in his opinion.

## VIII.  Step 5 Determination

### A.    Legal Standards

At step five of the disability analysis, the burden shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).  "Work which exists in the national economy" means work existing in significant numbers "either in the region where the individuals live or in several regions of the country." *McCusker v. Comm'r of Soc. Sec.*,

No. 1:13-CV-1074, 2014 WL 6610025, at *3 (N.D.N.Y. Nov. 20, 2014) (quoting SSR 82-53, 1982 WL 3134, at *3 (1982) (internal quotation marks removed).

In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[20] are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

---

[20] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

### B.    Analysis

In this case, although the ALJ found that plaintiff had nonexertional impairments,[21] he also determined that those impairments did not significantly limit the range of light work that plaintiff could perform. (T. 19-20).  Plaintiff argues that the ALJ erred in his determination to use only the grids and in failing to obtain the testimony of a VE.

The plaintiff argues that the ALJ failed to explain the basis for not using the services of a VE.  However, as defendant points out, the ALJ explained his rationale in detail, beginning his analysis by stating that "I must therefore determine the extent to which the claimant's nonexertional limitations reduce the occupational base of administratively noticed unskilled jobs." (T. 19).  In making this determination, the ALJ utilized the information contained in the Social Security Rulings. (T. 19-20).

Although the ALJ found that plaintiff could only "occasionally" climb, balance, stoop, kneel, crouch, and crawl, SSR 85-15 states that some limitation in climbing and/or balancing "'would not ordinarily have a significant impact on the broad world of work,'" and SSR 83-14 states that a person does not need to crouch and would only have to stoop occasionally to "perform all of the exertional requirements of most sedentary and light jobs." (T. 19).  If a person can stoop occasionally to pick things up, "the sedentary and light occupational base is virtually intact." (*Id.*) (citing SSR 85-15).

---

[21] The court notes that plaintiff does not make an argument about her mental impairment. Counsel stated at the hearing "this is pretty much an exertional limitations case . . . ." (T. 33).  Counsel likely meant physical rather than mental, because the nonexertional limitations that plaintiff alleges reduce the full range of work she could perform are physical. Plaintiff testified that depression (her mental condition) was not one of the original bases for her disability application. (T. 56).  She also stated that she had no mental issues prior to 2019, when her son was killed. (*Id.*)

Limitations on crawling and kneeling would also "be of little significance in the broad world of work." (*Id.*)

The ALJ then considered manipulative limitations. (T. 20).  According to SSR 85-15, reaching and handling are activities required in almost all jobs, and any "significant" limitation in those activities could eliminate a large number of occupations that an individual could perform, as could limitations in gross use of the hands for grasping, holding, and turning objects. (T. 20).  The ALJ correctly found that plaintiff retained the ability to frequently reach in all directions with both upper extremities and had no limitations for handling or fingering. (*Id.*)  The MSSs from her own treating physician, Dr. Qandah and the workers' compensation physician, Dr. Mutty support this assessment. (T. 410 (Dr. Qandah) - plaintiff has an "unlimited" ability to reach, handle finger, and feel), 464 (Dr. Mutty) - plaintiff can "frequently" grasp, manipulate, and reach).  Mr. Alessandrini also found that plaintiff could reach in all directions with both arms. (T. 362).  Dr. Lorensen found plaintiff's hand and finger dexterity intact, and her grip strength was 5/5 bilaterally. (T. 375).

The ALJ did consider plaintiff's mental impairment, finding that based on the mostly "benign" mental status examinations, and plaintiff's ability to follow instructions and get along with others, daily activities, and lack of problems with concentration, understanding, or coherence, plaintiff "remains capable of working in [an environment] that involves occasional decision-making, occasional changes in the work setting, and occasional use of judgment." (T. 20).  These limitations, and the "low-stress" requirement are all included in the ability to perform unskilled work.

"[B]asic communication is all that is needed to do unskilled work." *Shania W. v. Comm'r of Soc. Sec.*, No. 1:19-CV-00104, 2021 WL 3131182, at *5 (W.D.N.Y. July 23, 2021) (quoting SSR 96-9p).  It is sufficient to have the ability to hear and understand simple oral instructions or to communicate simple information. *Id*.  In addition, unskilled work ordinarily involves dealing primarily with objects, rather than with data or people. *Id.* (citing SSR 85-15).  Unskilled work requires little or no judgment to do simple duties that can be learned on the job in a short period of time. *See* 20 C.F.R. § 416.968.

Because plaintiff's nonexertional impairments did not "significantly erode the available occupational base for unskilled light work," the ALJ was justified in using the Grid as a framework, and the appropriate SSRs to determine that plaintiff was not disabled.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

**ORDERED**, that judgment be entered for the **DEFENDANT.**


Dated: June 7, 2022

Andrew T. Baxter
U.S. Magistrate Judge